**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

PLASTICS INDUSTRY ASSOCIATION,
    INC.,

               *Plaintiff*,

v.

ROB BONTA, in his Official Capacity as
Attorney General of California,

               *Defendant*.

Civil Action No. 1:24-cv-01542-APM

**MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY
INJUNCTION AND TEMPORARY RESTRAINING ORDER**

Manesh Kumar Rath
(DC Bar No. 457835)
KELLER HECKMAN LLP
1001 G Street NW
Suite 500 West
Washington, DC 20001
(202) 434-4182
(202) 434-4646 (fax)
rath@khlaw.com

Michael W. Kirk
(DC Bar No. 424648)
Adam P. Laxalt
(DC Bar No. 1670779)
John D. Ohlendorf
(DC Bar No. 1024544)
Athanasia O. Livas
(DC Bar No. 90011199)
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, NW
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (fax)
mkirk@cooperkirk.com
alaxalt@cooperkirk.com
johlendorf@cooperkirk.com
alivas@cooperkirk.com

*Attorneys for Plaintiff*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................... ii

INTRODUCTION .................................................................................................................. 1

BACKGROUND .................................................................................................................... 3

I.      PLASTICS' Extensive History of Association and Expression Related to Important
        Matters of Public Policy ............................................................................................. 3

II.     PLASTICS' Storage Agreement with the Hagley Library and Museum. ................... 4

III.    Mr. Bonta's Investigation and Subpoena. .................................................................. 5

IV.     The Resulting Chill on PLASTICS' and its Members' First Amendment Rights......... 10

LEGAL STANDARD .......................................................................................................... 11

ARGUMENT ....................................................................................................................... 12

I.      PLASTICS Is Likely To Succeed on the Merits ...................................................... 12

        A.      Mr. Bonta Is Subject to Personal Jurisdiction in the District of Columbia.......... 12

        B.      Mr. Bonta's Subpoena Violates the First Amendment ....................................... 15

                1.      Mr. Bonta's Subpoena Burdens the First Amendment Rights of
                        PLASTICS and its Members To Engage in Speech, Association, and
                        Petitioning Activity .................................................................................. 15

                2.      PLASTICS Retains First Amendment Rights in the Confidential
                        Documents Stored at the Hagley ............................................................. 22

                3.      Compelled Disclosure of the Subpoenaed Information Is Not Tailored
                        To Serve a Compelling State Interest ...................................................... 25

II.     Plaintiff Will Suffer Irreparable Harm Absent an Order Restraining the Enforcement
        of Mr. Bonta's Subpoena. ........................................................................................ 27

III.    The Balance of the Equities Favors Granting Preliminary Relief ............................ 28

CONCLUSION .................................................................................................................... 29

# TABLE OF AUTHORITIES

**Cases**                                                                             **Page**

*AFL-CIO v. FEC*,
  333 F.3d 168 (D.C. Cir. 2003) ........................................................................17, 18, 20, 22

*Americans for Prosperity Found. v. Bonta*,
  594 U.S. 595 (2021) ........................................................................................18, 26, 27

*American Trucking Associations v. City of Los Angeles*,
  2009 WL 10672284 (C.D. Cal. Dec. 21, 2009) ............................................................24

*Apple Inc. v. Match Grp., Inc.*,
  2021 WL 3727067 (N.D. Cal. Aug. 19, 2021) ..............................................................20

*Bantam Books, Inc. v. Sullivan*,
  372 U.S. 58 (1963) .........................................................................................................1

*Buckley v. Valeo*,
  424 U.S. 1 (1976) .............................................................................................1, 19, 26

*City of Greenville v. Syngenta Crop Prot., Inc.*,
  2011 WL 5118601 (C.D. Ill. Oct. 27, 2011) ...........................................................16, 20

*Cuviello v. City of Stockton*,
  2008 WL 4283260 (E.D. Cal. Sept. 16, 2008) ..............................................................27

*Davis v. Pension Benefit Guar. Corp.*,
  571 F.3d 1288 (D.C. Cir. 2009) ....................................................................................11

*DeGregory v. Attorney Gen. of New Hampshire*,
  383 U.S. 825 (1966) ......................................................................................................18

*Eastern R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*,
  365 U.S. 127 (1961) ......................................................................................................15

*Experience Works, Inc. v. Chao*,
  267 F. Supp. 2d 93 (D.D.C. 2003) ................................................................................11

*FEC v. Machinists Non-Partisan Pol. League*,
  655 F.2d 380 (D.C. Cir. 1981) ..................................................................................1, 17

*FTC v. Am. Tobacco Co.*,
  264 U.S. 298 (1924) ......................................................................................................26

*Food & Water Watch, Inc. v. Vilsack*,
  808 F.3d 905 (D.C. Cir. 2015) ......................................................................................12

*GTE New Media Servs. Inc. v. BellSouth Corp.*,
  199 F.3d 1343 (D.C. Cir. 2000) ....................................................................................12

*Hartley v. Wilfert*,
  918 F. Supp. 2d 45 (D.D.C. 2013) ................................................................................21

*Heller v. Nicholas Appelgate Cap. Mgmt. LLC*,
  498 F. Supp. 2d 100 (D.D.C. 2007) ..............................................................................12

*IMAPizza, LLC v. At Pizza Ltd.*,
    334 F. Supp. 3d 95 (D.D.C. 2018) .................................................................................14

*In re Burlington N., Inc.*,
    822 F.2d 518 (5th Cir. 1987) .........................................................................................28

*In re First Nat'l Bank, Englewood, Colo.*,
    701 F.2d 115 (10th Cir. 1983) .......................................................................................19

*In re GlaxoSmithKline PLC*,
    732 N.W.2d 257 (Minn. 2007) ......................................................................................17

*In re Kincaid*,
    2023 WL 5933341 (D.D.C. Aug. 9, 2023) ....................................................................19

*In re Motor Fuel Temperature Sales Prac. Litig.*,
    641 F.3d 470 (10th Cir. 2011) ..........................................................................16, 17, 19

*In re Subpoena Duces Tecum Served on Off. of Comptroller of Currency*,
    145 F.3d 1422 (D.C. Cir. 1998) ....................................................................................24

*In re Subpoena Served Upon Comptroller of Currency & Sec'y of Bd.*
    *of Governors of Fed. Rsrv. Sys.*,
    967 F.2d 630 (D.C. Cir. 1992) ......................................................................................24

*Karem v. Trump*,
    960 F.3d 656 (D.C. Cir. 2020) ......................................................................................28

*Klayman v. Obama*,
    142 F. Supp. 3d 172, 196 (D.D.C. 2015) ......................................................................28

*Lewis v. Mutond*,
    568 F. Supp. 3d 47 (D.D.C. 2021) ................................................................................12

*Lighthouse Res., Inc. v. Inslee*,
    2018 WL 3618263 (W.D. Wash. July 30, 2018) ..........................................................20

*Major League Baseball v. Crist*,
    331 F.3d 1177 (11th Cir. 2003) ...............................................................................26, 27

*McIntyre v. Ohio Elections Comm'n*,
    514 U.S. 334 (1995) ......................................................................................................15

*Media Matters for America v. Paxton*,
    2024 WL 1773197 (D.D.C. Apr. 12, 2024) ...........................................................3, 13, 14, 15

*Murphy v. U.S. Department of Army*,
    613 F.2d 1151 (D.C. Cir. 1979) ....................................................................................24

*NAACP v. Alabama ex rel. Patterson*,
    357 U.S. 449 (1958) ....................................................................1, 15, 16, 17, 22

*National Sec. Archive v. CIA*,
    752 F.3d 460 (D.C. Cir. 2014) ......................................................................................23

*New York State Nat'l Org. for Women v. Terry*,
    886 F.2d 1339 (2d Cir. 1989) .......................................................................................19

*NLRB v. Sears, Roebuck & Co.*,
    421 U.S. 132 (1975)................................................................................23

*Perry v. Schwarzenegger*,
    591 F.3d 1147 (9th Cir. 2010) ................................1, 16, 17, 18, 19, 20, 22, 23, 24, 25, 26

*Prysmian Cables & Sys. USA, LLC v. Szymanski*,
    573 F. Supp. 3d 1021 (D.S.C. 2021).......................................................29

*Pursuing Am.'s Greatness v. FEC*,
    831 F.3d 500 (D.C. Cir. 2016)...........................................................27, 28

*Quaker Action Grp. v. Hickel*,
    421 F.2d 1111 (D.C. Cir. 1969)..............................................................27

*Rockwell International Corp. v. U.S. Department of Justice*,
    235 F.3d 598 (D.C. Cir. 2001)......................................................23, 24, 25

*Sierra Club v. Union Elec. Co.*,
    2015 WL 9583394 (E.D. Mo. Dec. 31, 2015) ........................................20

*The Ohio Org. Collaborative v. Husted*,
    2015 WL 7008530 (S.D. Ohio Nov. 12, 2015).......................................20

*Trump v. Thompson*,
    20 F.4th 10 (D.C. Cir. 2021)...................................................................28

*Twitter, Inc. v. Paxton*,
    56 F.4th 1170 (9th Cir. 2022) .................................................................28

*United Mine Workers of America v. Illinois State Bar Ass'n*,
    389 U.S. 217 (1967).................................................................................16

*United States v. AT&T*,
    642 F.2d 1285 (D.C. Cir. 1980).........................................................24, 25

*United States v. Deloitte LLP*,
    610 F.3d 129 (D.C. Cir. 2010).................................................................25

*Unity08 v. FEC*,
    596 F.3d 861 (D.C. Cir. 2010).................................................................28

*Urquhart-Bradley v. Mobley*,
    964 F.3d 36 (D.C. Cir. 2020)...................................................................12

*Walden v. Fiore*,
    571 U.S. 277 (2014).................................................................................13

*Whole Woman's Health v. Smith*,
    896 F.3d 362 (5th Cir. 2018) ..................................................................20

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008).....................................................................................11

## Statutes

U.S. Const. amend. I................................................................................15

D.C. CODE
    § 13-423(a)(1) ....................................................................................................................12
    § 13-423(a)(3) ............................................................................................................12, 14

**<u>Other Authorities</u>**

Press Release, Rob Bonta, California Attorney General, Attorney General Bonta Announces
    Investigation into Fossil Fuel and Petrochemical Industries for Role in Causing Global
    Plastics Pollution Crisis (Apr. 28, 2022), https://bit.ly/4cv2zDb ......................................5

Press Release, Rob Bonta, Attorney General of California, Attorney General Bonta Petitions
    Court to Compel Plastics Industry Association and American Chemistry Council to Fully
    Comply with Outstanding Investigative Subpoenas (May 28, 2024),
    https://bit.ly/45Wz0bo .........................................................................................................9

## INTRODUCTION

The First Amendment to the United States Constitution "has its fullest and most urgent application" to speech on matters of public policy. *Buckley v. Valeo*, 424 U.S. 1, 15 (1976). An association's freedom to formulate policy views and advocate the interests of its members lies at the core of no fewer than *three* separate First Amendment rights: "the freedom of speech," U.S. CONST. amend. I; the right "to petition the Government," *id.*, and the "freedom of association," *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958). Because these essential liberties are particularly "vulnerable to gravely damaging yet barely visible encroachments," the First Amendment demands that they be "ringed about with adequate bulwarks." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 66 (1963).

One such bulwark is the "First Amendment privilege": the rule that the compulsory tools of civil discovery may not be used to require the disclosure of sensitive, internal "communications regarding strategy for lobbying," *In re Motor Fuel Temperature Sales Pracs. Litig.*, 641 F.3d 470, 481 (10th Cir. 2011), or "internal [political] campaign communications," *Perry v. Schwarzenegger*, 591 F.3d 1147, 1162 (9th Cir. 2010), unless the reasons for demanding disclosure can "survive exacting scrutiny," *id.* at 1160. For the forced disclosure of a party's "internal communications" or sensitive strategy documents—particularly the forced disclosure of these sensitive documents to the government itself—"carries with it a real potential for chilling the free exercise of political speech and association," thereby damaging "the very heart of the organism which the first amendment was intended to nurture and protect." *FEC v. Machinists Non-Partisan Pol. League*, 655 F.2d 380, 388 (D.C. Cir. 1981).

Defendant Rob Bonta, the Attorney General of California, is pursuing enforcement of a subpoena that is fundamentally at war with these First Amendment principles. For over 80 years,

the Plastics Industry Association ("PLASTICS") has represented the interests of its members—companies from every part of the plastics supply chain—by formulating strategies, messages, and advocacy relating to the public policy surrounding plastics production and use. In doing so, it has engaged in extensive internal communications with its members, communications that reveal not only the identities of many of those members, which are confidential, but also their sensitive, private deliberations over matters of internal strategy and messaging. On July 27, 2022, Mr. Bonta served a subpoena on PLASTICS at its headquarters in Washington, D.C., demanding production of a large volume of these internal communications. And despite PLASTICS' objection that these documents are protected from disclosure by the First Amendment—and its initiation of this lawsuit to protect its First Amendment rights—on May 28, 2024 Mr. Bonta raced to California state court, filing a petition to enforce his subpoena.

This Court should grant a temporary restraining order and preliminary injunction restraining the enforcement of Mr. Bonta's subpoena. The documents at issue lie at the heartland of the First Amendment's protection, and forcing their production would disclose the identities and private deliberations of PLASTICS and its members, severely chilling their rights to free association and expression by exposing their sensitive internal strategy communications to their public policy opponents and exposing them to harassment or protest for expressing their policy views in confidential, internal discussions. While some of PLASTICS' documents are stored by a third party, the Hagley Library and Museum, that does not diminish the First Amendment's protection, since PLASTICS' agreement with the Hagley ensures that its documents will be kept confidential and out of the hands of any individuals (like Mr. Bonta) who are averse to its First Amendment interests. And Mr. Bonta's apparent interest in accessing the documents—scouring

through eight decades of internal communications in the hopes that *something* that is damaging in some way may turn up—falls far short of the exacting scrutiny the First Amendment demands.

This Court recently enjoined Texas's attorney general from using his investigative authority to obtain documents from Media Matters, a progressive media company based in D.C., as contrary to the First Amendment. *See Media Matters for America v. Paxton*, 2024 WL 1773197 (D.D.C. Apr. 12, 2024). The First Amendment applies with equal force to California's attorney general, and Mr. Bonta's investigative subpoena must meet the same fate.

## BACKGROUND

### I. PLASTICS' Extensive History of Association and Expression Related to Important Matters of Public Policy.

For over eighty years, PLASTICS has contributed to the public dialogue about plastics and the appropriate state, local, and federal public policies relating to plastics. Seaholm Decl. ¶ 10. Created in 1937, PLASTICS is a member-run, non-profit trade association that represents the interests of members from every component of the plastics supply chain, including manufacturers. *Id.* ¶ 8. PLASTICS does not publish or disclose its membership lists, and some members wish for their membership in PLASTICS, or their involvement in particular PLASTICS activities or initiatives, to remain confidential. *Id.* ¶ 36. PLASTICS is organized and headquartered in the District of Columbia. *Id.* ¶ 9. Its office is located in the District of Columbia, its employees are almost entirely located in the District or the greater D.C. Area, and many of its meetings for members are held in the District of Columbia. *Id.*

Since its inception, PLASTICS and its members have engaged in extensive oral and written discussions about public policy; the development of local, state, and federal laws affecting the industry; and other matters of public importance. *Id.* ¶ 10. Much of PLASTICS' communication with its members about public policy has taken place through its internal, member-only

newsletters—including three newsletters entitled *Plastics Newsbriefs*, *President's Report to the Members*, and *State Bulletin*. In these newsletters and its other member communications, PLASTICS has shared with its members information about recently enacted statutes, ordinances, or regulations and their significance, in PLASTICS' estimation, for its members; pending or proposed ordinances, regulations, or bills; PLASTICS' participation in matters of public discourse related to the plastics industry; and the strategy and development of PLASTICS' positions, public messaging, and interactions with government officials, legislators, agencies, and their staff with respect to each of these matters of current or pending public policy. *Id.* ¶ 11.

These newsletters and other communications have, in the great majority of cases, been confidential and intended only for PLASTICS and its members. *Id.* ¶ 12. They thus include a variety of confidential and sensitive information, including the identities of individual members and PLASTICS' leadership, discussion of short- and long-term strategy relating to PLASTICS' engagement with legislators and other public officials on matters of public policy, and private and internal conversations about members' political or policy views and perspectives on proposed or recently enacted legislation, or proposed or recently promulgated regulations or ordinances. *Id.* PLASTICS' members have understood and believed that these communications would be confidential, and that understanding of confidentiality has been essential to the candid exchange of views that allows PLASTICS to develop positions on public policy and advocate for those positions on behalf of its members. *Id.* ¶ 35.

## II.   PLASTICS' Storage Agreement with the Hagley Library and Museum.

Since 1988, PLASTICS has stored a collection of its records, including many past issues of *Plastics Newsbriefs*, the *President's Report to the Members*, and the *State Bulletin*, at the Hagley Museum and Library in Wilmington, Delaware, pursuant to a Memorandum of Agreement (the "Hagley Agreement") governing the storage and use of the documents. *Id.* ¶ 18. The Hagley

Agreement was first executed on March 4, 1988, and it remains in force for an initial and successive twenty-year periods unless terminated in accordance with its terms. *Id.* ¶¶ 18–19.

Under the Hagley Agreement, the Hagley Museum and Library stores the records in question, and PLASTICS has authorized the records in the collection to be used for the purpose of facilitating scholarly research. *Id.* ¶ 22. But all of the documents in the collection remain the property of PLASTICS, and PLASTICS retained all copyrights and rights of publication in the documents. Moreover, access to the documents is strictly limited, by the terms of the Hagley Agreement, to either PLASTICS employees; those conducting scholarly research, who must follow specific requirements and procedures to obtain access and may only quote extensively from the documents with PLASTICS' permission; and those to whom PLASTICS provides express consent to access the documents. Moreover, under the Hagley's own policies, Hagley's records are explicitly *not* available to individuals seeking to access them for purposes of current or potential litigation unless they receive consent in advance. *Id.* ¶ 26.

## III.   Mr. Bonta's Investigation and Subpoena.

On April 28, 2022, Mr. Bonta launched a highly publicized investigation into companies he asserted were to blame for a "global plastics pollution crisis." According to an accompanying press release, he planned to "target companies that have caused and exacerbated the global plastics pollution crisis, their role in perpetuating myths around recycling, and the extent to which this deception is still ongoing."[1] On the same day, Mr. Bonta sent to PLASTICS at its Washington, D.C. office a "Preservation Notice." In that notice, Mr. Bonta announced that his office had initiated an investigation into "past *and ongoing* violations of law in connection with the

---

[1] Press Release, Rob Bonta, California Attorney General, Attorney General Bonta Announces Investigation into Fossil Fuel and Petrochemical Industries for Role in Causing Global Plastics Pollution Crisis (Apr. 28, 2022), https://bit.ly/4cv2zDb.

production and marketing of plastics and plastics recycling." Seaholm Decl. ¶ 13. To date, his office has not brought suit or filed charges against any company or individual as a result of this investigation.

On July 27, 2022, Mr. Bonta issued a sweeping subpoena upon PLASTICS. PLASTICS did not accept the subpoena in the State of California (where it has no presence); instead, Mr. Bonta served the subpoena on PLASTICS in Washington, D.C. *Id.* ¶ 14. Mr. Bonta's subpoena requested: "all DOCUMENTS and COMMUNICATIONS that were at any time housed at, on loan to, or in the possession of the Hagley Museum and Library, located in Wilmington, Delaware." Investigative Subpoena for Recs. & Docs. at 10 (July 27, 2022), attached to Seaholm Decl. as Exhibit 2 ("Subpoena"). This request was made without qualification of any kind based on timeframe or subject matter. Mr. Bonta also sought all past issues of *Plastics Newsbriefs*, the *President's Report to the Members*, and the *State Bulletin*—again, without qualification as to timeframe or subject matter.

PLASTICS objected that Mr. Bonta lacked the authority to exercise jurisdiction over PLASTICS and reserved the right to later assert additional objections. It nonetheless agreed to cooperatively produce some non-privileged and non-protected documents, subject to objections, in an attempt to avoid an unnecessary dispute. On September 15, 2022, after conducting an internal search, PLASTICS provided responsive documents, subject to the objections that PLASTICS had either asserted or reserved. Compl. ¶ 36.

On September 20, 2022, Mr. Bonta's office informed PLASTICS that, in addition to internally located documents, Mr. Bonta believed that PLASTICS also owned documents stored at the Hagley Library and Museum. *Id.* ¶ 37. PLASTICS confirmed that it did in fact own documents located at the Hagley, and it promptly began reviewing documents stored there. *Id.*

¶ 38. On May 19, 2023, PLASTICS sent amended objections to Mr. Bonta's office, along with a second production of documents. *Id.* ¶ 39. On July 5, 2023, PLASTICS produced a third set of documents. *Id.* ¶ 40. These two productions were subject to objections and claims of privilege, including the First Amendment privilege. *Id.* ¶ 41.

Among other objections, PLASTICS objected to the requests as overbroad, ambiguous, and not tailored to the scope of the stated purpose of the investigation. PLASTICS therefore proposed to image relevant documents and, within that set, to identify privileged documents and to reserve the question of what privileges attach to irrelevant documents for a later date if it later became necessary. *Id.* Mr. Bonta's staff agreed with this approach, and on May 19, 2023, PLASTICS submitted to Mr. Bonta a categorical list of examples of irrelevant documents stored at the Hagley. *Id.* ¶ 42. At Mr. Bonta's office's request, on July 26, 2023, PLASTICS also furnished Mr. Bonta with a privilege log. *Id.* ¶ 43.

On April 5, 2024, after over eight months of silence, Mr. Bonta's office issued a demand letter to PLASTICS summarily rejecting PLASTICS' assertion of a privilege under the First Amendment. April 5, 2024 Letter, attached to Seaholm Decl. as Exhibit 5. Mr. Bonta insisted that PLASTICS must unilaterally waive its First Amendment rights and produce all documents withheld as privileged, or Mr. Bonta would seek to enforce his subpoena. *Id.* PLASTICS proceeded to meet and confer with Mr. Bonta over the next month and a half, but it became increasingly clear that Mr. Bonta never had any intention of respecting PLASTICS' claim of privilege. Specifically, while PLASTICS offered to provide redacted copies of the documents in question that removed any privileged material, in a letter dated April 29, 2024, Mr. Bonta rejected that offer, stating that "[u]nless and until PLASTICS can establish that any privilege applies, there is no basis for redacting documents that PLASTICS is otherwise required to produce in full. Thus,

PLASTICS' offer to redact documents is rejected, at this time." April 29, 2024 Letter, attached to Seaholm Decl. as Exhibit 6.

Because PLASTICS would not capitulate to Mr. Bonta's unreasonable demands, and would instead maintain its assertion of privilege, Mt. Bonta began to threaten to access the documents unilaterally. While the Hagley had informed Mr. Bonta on April 26 that it could not allow anyone from Mr. Bonta's office to view PLASTICS' documents without its consent, Mr. Bonta nonetheless claimed in his April 29, 2024 correspondence that the Hagley had "invited" his office to view documents *with or without* PLASTICS' consent, so long as he provided "prior notice." Exhibits 6 and 7. PLASTICS was dismayed by Mr. Bonta's threat that his staff would unilaterally help themselves to the privileged documents, without PLASTICS' permission and over its express objections, and it accordingly reached out to Mr. Bonta on May 21, 2024, and again on May 24, 2024, stating that it was available for a phone call at Mr. Bonta's earliest convenience and that PLASTICS was in favor of a solution to the dispute over the privileged documents short of litigation. PLASTICS did not receive any response to these communications.

In light of Mr. Bonta's failure to respond in substance to PLASTICS' privilege assertions, and his threats to help himself to the privileged documents, PLASTICS filed its complaint in this Court on May 24, 2024. Upon learning of the suit, Mr. Bonta promptly filed a petition in California state court to enforce his subpoena. Petition to Enforce Investigative Subpoena, *People v. The Plastics Indus. Ass'n*, No. 24CV010509 (Cal. Super. Ct. May 28, 2024), attached to Seaholm Decl. as Exhibit 8. The petition alleges that PLASTICS has engaged in "an aggressive—and deceptive— marketing and advertising campaign to convince the public that it could recycle its way out of the plastic waste and pollution problem." *Id.* ¶ 12. Yet the petition does not provide or allege a single example of deceptive marketing or advertising on behalf of PLASTICS—itself a non-commercial

advocacy organization that does not sell any products to consumers. Nor does the petition provide a single legal citation to support Mr. Bonta's claim that PLASTICS' documents are not privileged. Instead, Mr. Bonta pointed to the age of the documents, and a citation from a document that PLASTICS did indeed produce, as grounds for his argument that the documents are not privileged.

On the same day that he filed the California state-court petition, Mr. Bonta issued a press release promoting his "first-of-its-kind investigation into fossil fuel and petrochemical industries for their role in causing the plastics pollution crisis." Press Release, Rob Bonta, Attorney General of California, Attorney General Bonta Petitions Court to Compel Plastics Industry Association and American Chemistry Council to Fully Comply with Outstanding Investigative Subpoenas (May 28, 2024), https://bit.ly/45Wz0bo. The press release features politically charged rhetoric criticizing the plastics industry, speculation that the documents at the Hagley "likely" include information relevant to his investigation, and false assertions that PLASTICS documents at the Hagley were once open to the public, even though PLASTICS' contract with the Hagley has always required members of the general public seeking to view the documents to obtain PLASTICS' permission in advance. *Id.*

On June 5, 2024, Mr. Bonta sought PLASTICS' consent to a request for an additional thirty days to file his responsive pleadings in this matter, which PLASTICS provided. Five days later, on June 10, Mr. Bonta filed the request with this Court; and on June 13 M. Bonta scheduled an Ex-parte Hearing on his Ex Parte Application for Order to Show Cause in the California state-court litigation. Ex Parte Application to Show Cause Regarding Investigative Subpoena, *Plastics Indus. Ass'n*, No. 24CV010509 (Cal. Super. Ct. June 14, 2024), attached to Seaholm Decl. as Exhibit 9. And on June 17, Mr. Bonta issued a Preservation Notice to the Hagley Museum and Library. June 17, 2024 Letter, attached to Seaholm Decl. as Exhibit 10. In light of this notice,

PLASTICS continues to fear that Mr. Bonta may carry out his threat to go to the Hagley and unilaterally seize access to the documents in question over PLASTICS' objections and in the teeth of its claims of First Amendment privilege.

In light of Mr. Bonta's attempts to unlawfully access its documents stored at the Hagley, PLASTICS has begun the process of reclaiming custody over the documents. On June 3 it informed the Hagley that it would be terminating its agreement with them and beginning the effort of retrieving the documents. The Hagley has cooperated with PLASTICS' efforts to reclaim custody over the documents, and PLASTICS' discussions with the Hagley over retrieving the documents are still ongoing, but as of the date of this filing, the documents remain in the Hagley's possession. Seaholm Decl. ¶ 34.

## IV.    The Resulting Chill on PLASTICS' and its Members' First Amendment Rights.

Mr. Bonta's attempts to access sensitive, confidential documents have had an immediate and ongoing chilling effect on the First Amendment expression and association of PLASTICS and its members. The very fact that the disclosure of the privileged documents at issue would reveal the identities of PLASTICS' members alone imposes a significant chill. PLASTICS' membership lists are confidential, and many of its members do not wish their identities or membership to become public; as a result, members have informed PLASTICS that their participation in its activities would cease if it were compelled to produce documents and communications revealing their identities. Seaholm Decl. ¶ 48.

The threat that the substance of PLASTICS' confidential communications with its members may be revealed also, of course, imposes a significant chill. The issuance of Mr. Bonta's subpoena, and the potential disclosure of PLASTICS' communications and resulting threat of harassment or reprisal, has severely chilled PLASTICS' ability to communicate with its members and formulate positions on important matters of public policy. For instance, PLASTICS has

decided not to resume publication of a newsletter like the *President's Report to the Members*, specifically because it is a document that Mr. Bonta is demanding. *Id.* ¶ 41. And PLASTICS' leadership has more generally been forced to limit their written communications to PLASTICS members in light of Mr. Bonta's subpoena. *Id.* ¶ 45. The resulting chill has significantly hampered PLASTICS' ability to formulate public policy positions and advocate on behalf of its membership. For example, PLASTICS has substantially curtailed its communications with its members about public policy issues relating to recycling as a result of Mr. Bonta's subpoena and other efforts to acquire its confidential documents. *Id.* ¶¶ 43–47. And members have limited their internal expressions of opinion regarding public policy as a result of Mr. Bonta's demands, in some cases declining to discuss matters of public policy at all out of fear that any recorded communications may one day fall into the hands of their public policy opponents. *Id.* ¶¶ 44, 48.

## LEGAL STANDARD

For this Court to grant a preliminary injunction, PLASTICS must establish: (1) likelihood of success on the merits; (2) that PLASTICS is "likely to suffer irreparable harm in the absence of preliminary relief;" (3) that the "balance of equities tips in [PLASTICS'] favor;" and (4) that "an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The issuance of a temporary restraining order requires showing the same elements. *Experience Works, Inc. v. Chao*, 267 F. Supp. 2d 93, 96 (D.D.C. 2003). This Court evaluates the four preliminary injunction factors on a "sliding scale"—if a "movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor." *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1291–92 (D.C. Cir. 2009). Here, all four factors are met, and this Court should enter an order restraining enforcement of Mr. Bonta's subpoena.

**ARGUMENT**

I.      **PLASTICS Is Likely To Succeed on the Merits.**

      **A.**      **Mr. Bonta Is Subject to Personal Jurisdiction in the District of Columbia.**

PLASTICS is likely to show that Mr. Bonta is subject to personal jurisdiction in this forum. *See Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015) ("[T]he 'merits' on which plaintiff must show a likelihood of success encompass not only substantive theories but also establishment of jurisdiction." (quoting *Obama v. Klayman*, 800 F.3d 559, 565 (D.C. Cir. 2015)). Personal jurisdiction depends on "a two-part inquiry: A court must first examine whether jurisdiction is applicable under the state's long-arm statute and then determine whether a finding of jurisdiction satisfies the constitutional requirements of due process." *GTE New Media Servs. Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1347 (D.C. Cir. 2000).

The District of Columbia's long-arm statute authorizes jurisdiction over any person who "transact[s] any business in the District of Columbia" or "caus[es] tortious injury in the District of Columbia by an act or omission in the District of Columbia." D.C. CODE §§ 13-423(a)(1) & (3). The first, "transacting any business" clause has been interpreted as extending "jurisdiction to the full extent allowed by the Due Process Clause," and the determination whether jurisdiction exists under this provision and under the Due Process Clause thus "merge into a single inquiry." *Urquhart-Bradley v. Mobley*, 964 F.3d 36, 44 (D.C. Cir. 2020) (citations omitted). Principles of due process, in turn, allow the exercise of specific personal jurisdiction where, as relevant here, (1) the defendant has "purposefully directed" its activity at a resident of the forum and (2) the plaintiff's claims "arise out of or relate to the defendant's contacts with the forum." *Lewis v. Mutond*, 568 F. Supp. 3d 47, 52 (D.D.C. 2021) (cleaned up). Even "a single act, so long as it creates [a] 'substantial connection,' is sufficient." *Heller v. Nicholas Appelgate Cap. Mgmt., LLC*, 498 F. Supp. 2d 100, 109–10 (D.D.C. 2007) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 n.18 (1985)).

This Court's recent decision in a directly analogous case, *Media Matters for America*, 2024 WL 1773197, is instructive here. In *Media Matters*, the well-known progressive media company sought to enjoin a Civil Investigative Demand ("CID") issued by Texas Attorney General Ken Paxton seeking to compel production of Media Matters' internal communications about an article it had published. This Court held that Mr. Paxton was subject to personal jurisdiction in this forum because he had "caused service of the CID in the District of Columbia through a professional process service" and "because the CID established a future course of dealing with a D.C. resident," both of which satisfied the "transacting business" clause of the District's long-arm statute and minimum-contacts requirement of due process. *Id.* at *10–11 (internal quotation marks omitted). It further held that Mr. Paxton was also subject to jurisdiction under the long-arm statute's "tortious injury" clause—and the Due Process Clause's "express aiming" standard—because his "service of process, through an agent, was an act in the District of Columbia that injured Plaintiffs' constitutionally protected interests." *Id.* at *13.

Personal jurisdiction exists over Mr. Bonta under the very same reasoning for three independent reasons. First, Mr. Bonta "invoked the benefits and protections of the District's laws," *id.* at *10, when he reached into D.C. by (1) serving his subpoena on PLASTICS in the District, Seaholm Decl. ¶ 14, (2) causing his agents to enter the District of Columbia to attempt to serve his California state-court petition and ex parte application to enforce that subpoena on PLASTICS here, and (3) ultimately serving the petition and ex parte application on PLASTICS in the District via email, *see* Seaholm Decl. ¶ 32. It is well-settled that "although physical presence in the forum is not a prerequisite to jurisdiction, physical entry in the State—either by the defendant in person *or through an agent*, goods, *mail, or some other means*—is certainly a relevant contact" for purposes of personal jurisdiction. *Walden v. Fiore*, 571 U.S. 277, 285 (2014) (emphases added)

(citation omitted); *see also IMAPizza, LLC v. At Pizza Ltd.*, 334 F. Supp. 3d 95, 113 (D.D.C. 2018). And in accordance with this principle, "[c]ourts have found that the hiring of a process server creates an agency relationship between the attorney and process server, and that relationship establishes the attorney's presence in the jurisdiction to satisfy the 'minimum contacts' requirement." *Media Matters for America*, 2024 WL 1773197, at *10.

Second, jurisdiction is present because Mr. Bonta's subpoena "established a future course of dealing with a D.C. resident." *Id.* The subpoena seeks documents from PLASTICS, a party located in the District of Columbia; PLASTICS conducted a search of its internally located documents in the District of Columbia; and PLASTICS must review documents and respond to Mr. Bonta's demands from its offices here in the District of Columbia. Moreover, Mr. Bonta knew (or surely should have known) that his subpoena "would require negotiations with [PLASTICS'] counsel, who is based in the District." *Id.* Indeed, PLASTICS' officers and attorneys have already engaged—from D.C.—in extensive negotiations and interactions with Mr. Bonta, as a result of the subpoena, over privilege objections, the scope of the search, and similar matters. Accordingly, "[b]y targeting a D.C.-based entity for investigation and demanding records from it, Defendant committed himself to a potentially long course of dealing in the District. In such circumstances, Defendant should have reasonably foreseen that he would be called into court here." *Id.*

Finally, personal jurisdiction is also appropriate under clause (a)(3) of D.C.'s long-arm statute because Mr. Bonta has committed "an act or omission in the District of Columbia"—serving his subpoena and demands for compliance, here—that "caus[ed] tortious injury in the District of Columbia"—the infringement of PLASTICS' First Amendment rights. D.C. CODE § 13-423(a)(3). The existence of jurisdiction under this clause is "straightforward: Defendant's service of process, through an agent, was an act in the District of Columbia that injured [PLASTICS']

constitutionally protected interests" by "caus[ing] chilling effects in the District." *Media Matters for America*, 2024 WL 1773197, at *13. And because this impingement upon PLASTICS' First Amendment interests is an "intentional and allegedly tortious action[] expressly aimed at [the District of Columbia]," it also meets the minimum requirements of due process. *Id.* (cleaned up).

For each of these reasons, PLASTICS is likely to succeed in showing that Mr. Bonta is subject to the court's personal jurisdiction.

### B.     Mr. Bonta's Subpoena Violates the First Amendment.

Plaintiff is also likely to succeed in showing that the subpoena is contrary to the First Amendment. The rights of association and expression that PLASTICS and its members engage in lie at the very core of the First Amendment's protective sweep, and the enforcement of Mr. Bonta's subpoena severely burdens and chills those rights in a way that is not tailored to serve any compelling or important state interest.

### 1.     Mr. Bonta's Subpoena Burdens the First Amendment Rights of PLASTICS and its Members To Engage in Speech, Association, and Petitioning Activity.

Since the landmark decision in *NAACP v. Alabama*, it has been settled that the First Amendment protects against the compelled disclosure of information and communications when such disclosure would chill constitutionally protected political speech, association, or activity. "No form of speech is entitled to greater constitutional protection" than the "advocacy of a politically controversial viewpoint." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 347 (1995). And speech uttered to persuade the public, legislators, or other government officials on matters of public policy is also protected by the First Amendment right "to petition the Government," U.S. Const. amend. I; *see Eastern R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 138 (1961), as well as the "freedom to engage in association for the advancement of beliefs and

ideas" that is necessary to "[e]ffective advocacy of both public and private points of view, particularly controversial ones," *NAACP*, 357 U.S. at 460.

Because the First Amendment would "be a hollow promise if it left government free to destroy or erode its guarantees by indirect restraints so long as no law is passed that prohibits free speech, press, petition, or assembly as such," *United Mine Workers of America v. Illinois State Bar Ass'n*, 389 U.S. 217, 222 (1967), the courts have long held that "the government must justify its actions not only when it imposes direct limitations on associational rights, but also when governmental action 'would have the practical effect of discouraging' the exercise of constitutionally protected political rights,' " *Perry*, 591 F.3d at 1159–60 (quoting *NAACP*, 357 U.S. at 461). And "[t]he compelled disclosure" of "political associations" or "internal . . . communications" from within an organization dedicated to advocating particular interests on matters of public concern "can have just such a chilling effect." *Id.* at 1160–62.

That is so for at least three reasons. "First, the disclosure of such information can have a deterrent effect on participation" by the members of an association. *Id.* at 1162. "It is hardly a novel perception that compelled disclosure of affiliation with groups engaged in advocacy" may "induce members to withdraw . . . and dissuade others from joining it because of fear of exposure of their beliefs shown through their associations and of the consequences of this exposure." *NAACP*, 357 U.S. at 462–63. "Second, disclosure of internal . . . information can have a deterrent effect on the free flow of information within" an association dedicated to some interest. *Perry*, 591 F.3d at 1162; *see also Motor Fuel Temperature*, 641 F.3d at 490 (compelled disclosures of associational information can "stifle full and frank discussions within and among" associations); *City of Greenville v. Syngenta Crop Prot., Inc.*, 2011 WL 5118601, at *6 (C.D. Ill. Oct. 27, 2011) (similar). "Implicit in the right to associate with others to advance one's shared political beliefs is

the right to exchange ideas and formulate strategy and messages, and to do so in private. Compelling disclosure of internal . . . communications can chill the exercise of these rights." *Perry*, 591 F.3d at 1162–63. And third, disclosure of confidential communications internally discussing some controversial matter of public policy may also have an additional kind of chilling effect because those communications "could be used by [the association's political opponents] to gain an unfair advantage . . . in the political arena." *Id.* at 1163 n.10 (cleaned up).

Courts have guarded against these potentially devastating burdens on free speech and free political association by applying a First Amendment privilege against the compelled disclosure of the internal communications that are created and circulated within an association dedicated to advocating for particular interests or points of view. *Id.* at 1153. The privilege protects, of course, confidential identifying information—such as "records containing the names and addresses of [the] 'members' and 'agents' of the Association." *NAACP*, 357 U.S. at 453. And it also protects an association's internal strategic communications pertaining to public messaging, "lobbying efforts," and other communications "regarding legislative policy." *Motor Fuel Temperature*, 641 F.3d at 489–90; *see also Perry*, 591 F.3d at 1153 ("internal campaign communications concerning strategy and messaging" including "draft versions of communications never actually disseminated to the electorate"); *Machinists*, 655 F.2d at 388 ("all available materials which concern a certain political group's 'internal communications' "); *In re GlaxoSmithKline PLC*, 732 N.W.2d 257, 268 (Minn. 2007) ("internal interactions and communications"); *AFL-CIO v. FEC*, 333 F.3d 168, 176–77 (D.C. Cir. 2003) ("detailed descriptions of training programs, member mobilization campaigns, polling data, and state-by-state strategies").

In *Perry*, for example, the plaintiffs challenging the California ballot proposition formerly prohibiting same-sex marriage sought discovery from the proponents of the ballot initiative (who

had intervened in the litigation to defend the law), including the production of their "internal campaign communications concerning strategy and messaging" during their effort to convince Californians to adopt the initiative. 591 F.3d at 1153. The U.S. Court of Appeals for the Ninth Circuit blocked that attempt under the First Amendment privilege, holding that the First Amendment protects "the right to exchange ideas and formulate strategy and messages, and to do so in private." *Id.* at 1162. The court explained that "disclosure of internal campaign information can have a deterrent effect on the free flow of information within campaigns," and can thereby "chill the exercise of [First Amendment] rights." *Id.* at 1162–63. Similarly, in *AFL-CIO*, the D.C. Circuit held that the First Amendment privilege barred the disclosure of "internal planning materials" possessed by both the AFL-CIO and the Democratic National Committee, including "detailed descriptions of training programs, member mobilization campaigns, polling data, and state-by-state strategies." 333 F.3d at 176–77. The court explained that this disclosure would "seriously interfere[] with internal group operations and effectiveness," and it thus impermissibly "intrude[d] on the privacy of association and belief guaranteed by the First Amendment." *Id.* at 177–78 (quotation marks omitted). And the U.S. Supreme Court has itself blocked, under the First Amendment, compelled disclosure of an individual's "political associations of an earlier day, the meetings he attended, and the views expressed and ideas advocated at any such gatherings," *DeGregory v. Attorney Gen. of New Hampshire*, 383 U.S. 825, 828 (1966), as well as the identities of donors to charitable organizations, *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 600–01 (2021).

Where a party invokes the First Amendment privilege, courts apply "a two-part framework." *Perry*, 591 F.3d at 1160; *see also AFL-CIO*, 333 F.3d at 175–76. "The party asserting the privilege must [first] demonstrate a prima facie showing of arguable first amendment

infringement," *Perry*, 591 F.3d at 1160 (cleaned up), by establishing a "reasonable probability," *Buckley*, 424 U.S. at 74, that "enforcement of the discovery requests will result in . . . consequences which objectively suggest an impact on, or 'chilling' of, [First Amendment] rights," *Perry*, 591 F.3d at 1160 (cleaned up). The burden of "making out a *prima facie* case of harm . . . is light," *New York State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1355 (2d Cir. 1989), and a party asserting the First Amendment privilege needs to demonstrate only "that it has a First Amendment interest at stake"—e.g., that disclosure of documents would have a "chilling effect" on conduct protected by the First Amendment. *In re Kincaid*, 2023 WL 5933341, at *5, *7 (D.D.C. Aug. 9, 2023); *see also id*. at *5 n.5. Once a *prima facie* case has been made, the burden shifts to the party requesting the disclosure to justify the resulting threat to First Amendment rights. *Perry*, 591 F.3d at 1161; *see also Motor Fuel Temperature*, 641 F.3d at 488; *In re First Nat'l Bank, Englewood, Colo.*, 701 F.2d 115, 118 (10th Cir. 1983); *National Org. for Women*, 886 F.2d at 1355.

    As detailed above, the Declaration by Mr. Seaholm, PLASTICS' President and CEO, easily makes a *prima facie* case that PLASTICS' First Amendment rights are at stake. The internal, member-only newsletters sought by Mr. Bonta's subpoena contain the names of PLASTICS members—information that is confidential and that many members wish to remain so. And the withheld documents would also reveal confidential internal communications, strategizing, and debates over the development of PLASTICS' position with respect to pending legislation, regulations, ordinances, and other public policy proposals. Seaholm Decl. ¶ 35. PLASTICS' members expected that the documents would be maintained confidentially, and the documents' "disclosure would have the practical effects of discouraging political association and inhibiting internal campaign communications that are essential to effective association and expression." *Perry*, 591 F.3d at 1163. Moreover, these sensitive communications and documents would be

disclosed to PLASTICS' avowed *public policy opponent*, making the First Amendment burden of forced disclosure "[e]ven more disturbing." *Whole Woman's Health v. Smith*, 896 F.3d 362, 373 (5th Cir. 2018); *see also AFL-CIO*, 333 F.3d at 177; *The Ohio Org. Collaborative v. Husted*, 2015 WL 7008530, at *4 (S.D. Ohio Nov. 12, 2015) (prohibiting disclosure of "sensitive political information" to "parties that can reasonably be perceived as political adversaries"); *Lighthouse Res., Inc. v. Inslee*, 2018 WL 3618263, at *4–5 (W.D. Wash. July 30, 2018) (prohibiting disclosure of "internal strategies and communications" to a public-advocacy "campaign's adversary" because it "would give the proverbial fox the keys to the henhouse"); *Apple Inc. v. Match Grp., Inc.*, 2021 WL 3727067, at *8 (N.D. Cal. Aug. 19, 2021) ("Turning over the Coalition's internal communications *to Apple*—its public policy opponent—would chill any further participation in the organization.").

Courts have routinely found affidavits articulating similar harmful effects from disclosure sufficient to make a *prima facie* showing. *See Perry*, 591 F.3d at 1163 (affidavits declaring that enforcement of the discovery request would negatively impact participation, internal communications, and formulation of strategy by "discouraging political association and inhibiting internal campaign communications that are essential to effective association and expression"); *AFL-CIO*, 333 F.3d at 176–77 ("[T]he AFL-CIO and DNC affidavits charge that disclosing detailed descriptions of training programs, member mobilization campaigns, polling data, and state-by-state strategies will directly frustrate the organizations' ability to pursue their political goals effectively by revealing to their opponents' 'activities, strategies and tactics [that] we have pursued in subsequent elections and will likely follow in the future.' "); *City of Greenville*, 2011 WL 5118601, at *7 (similar); *Sierra Club v. Union Elec. Co.*, 2015 WL 9583394, at *2–3 (E.D. Mo. Dec. 31, 2015) (similar).

It thus follows as a matter of precedent and common sense that disclosure of sensitive information of this kind would chill the future exercise of First Amendment rights of association and expression. And though not dispositive itself, PLASTICS' "actual response" to Mr. Bonta's conduct further "provides some evidence of the tendency of that conduct to chill first amendment activity." *Hartley v. Wilfert*, 918 F. Supp. 2d 45, 54 (D.D.C. 2013) (quoting *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005)). Here, as detailed above and in Mr. Seaholm's declaration, Mr. Bonta's actions have already caused an immediate chilling effect on PLASTICS' staff and its members. PLASTICS has declined to resume the publication of certain communications to its members, due to fear that the California Attorney General will demand unlimited access to such communications, as he is doing in the instant case. Seaholm Decl. ¶ 41. Some PLASTICS staff have stopped engaging in open discourse—including the free and candid exchange of information and the formation and development of the Association's public policy positions—knowing that their private views and communications could be disclosed if a First Amendment privilege is not protected. *Id.* ¶ 43. And PLASTICS members have likewise purposefully declined to discuss public policy issues—or declined to discuss them as candidly and fully—out of fear that their internal discussions may be disclosed. *Id.* ¶ 44.

All of this severely hampers PLASTICS' ability to achieve its fundamental purpose: to advance the common interest of members, share information, and advocate on legislative, regulatory, public policy, and other matters concerning plastics. As a member-driven association, PLASTICS relies on member participation to operate day-to-day and to achieve its aims, and it cannot function effectively if that member participation is chilled. *Id.* ¶ 49. Moreover, PLASTICS faces greater difficulty in creating or maintaining records with respect to the development of public

policy positions and faces an immediate reduction in the development of public policy positions, for fear that all such discussions will subsequently be made public. *Id.* ¶ 50.

There can thus be no serious question that Mr. Bonta's subpoena is "likely to affect adversely the ability of [PLASTICS] and its members to pursue their collective effort to foster beliefs which they admittedly have the right to advocate." *AFL-CIO*, 333 F.3d at 176 (quoting *NAACP*, 357 U.S. at 462–63).

### 2. PLASTICS Retains First Amendment Rights in the Confidential Documents Stored at the Hagley.

PLASTICS is also likely to show that the First Amendment protects the documents at issue notwithstanding the fact that some of them are stored at the Hagley pursuant to the Hagley Agreement. While PLASTICS has committed the custody of many of its records to the Hagley, the terms of the Hagley Agreement ensure that they remain confidential and protected from disclosure to anyone adverse to PLASTICS' First Amendment interests. As noted, under that agreement access may only be granted to (1) PLASTICS' own employees, (2) individuals conducting scholarly research, and (3) individuals or entities to whom PLASTICS expressly agrees access may be granted. Seaholm Decl. ¶¶ 22, 27. Those strict confidentiality provisions ensure that the documents in question will remain out of reach of anyone whose access would chill the expressive, associational, and petitioning rights of PLASTICS and its members.

In these circumstances, the fact that PLASTICS committed its records to the Hagley for storage did not amount to any waiver of its First Amendment privilege to keep those documents out of unfriendly hands. The First Amendment does not protect secrecy for secrecy's sake. Instead, as discussed above, the First Amendment protection of an association's internal communications and membership information serves three purposes. "First, the disclosure of such information can have a deterrent effect on participation" by the members of an association. *Perry*, 591 F.3d at 1162.

22

Second, publicizing this information may also deter "the free flow of information within" the association. *Id.* And third, if the privileged information fell into the wrong hands, it "could be used by [the association's political opponents] to gain an unfair advantage . . . in the political arena." *Id.* at 1163 n.10 (cleaned up). The limited disclosure allowed by the Hagley Agreement does not harm any of these interests: so long as it is accessed only by scholarly researchers and those to whom PLASTICS specifically consents, there is no risk that PLASTICS' privileged information will come into the possession of those who would retaliate against, chill, or seek an unfair political advantage over PLASTICS or its members. This limited disclosure to the Hagley—consistent with its First Amendment interests—thus did not amount to a waiver of PLASTICS' First Amendment rights.

There is little precedent on the extent to which a limited disclosure of confidential documents waives the First Amendment privilege, but case law from the context of closely analogous privileges strongly supports PLASTICS. Like the First Amendment Privilege, for instance, the deliberative process privilege protects the government's "decisionmaking process" from the chill to "frank discussion of legal or policy matters" that would result "if the discussion were made public." *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150–51 (1975); *see National Sec. Archive v. CIA*, 752 F.3d 460, 462 (D.C. Cir. 2014) ("If agencies were to operate in a fishbowl, the frank exchange of ideas and opinions would cease and the quality of administrative decisions would consequently suffer." (cleaned up)). And consistent with that purpose, the courts have held that a limited disclosure of deliberative materials on terms that continue to ensure their confidentiality does not waive the privilege.

In *Rockwell International Corp. v. U.S. Department of Justice*, for example, the D.C. Circuit held that an internal DOJ report was privileged even though it had been shared with a

House subcommittee, because "the Justice Department gave the documents to the Subcommittee only after the Subcommittee expressly agreed not to make them public. Thus, far from intending to waive the [document's] confidentiality, the Justice Department attempted to preserve it." 235 F.3d 598, 604 (D.C. Cir. 2001). Similarly, in *Murphy v. U.S. Department of Army*, the D.C. Circuit upheld the Army's claim of deliberative process privilege even though it had shared the document in question with a member of Congress *without* any express assurance of confidentiality, reasoning that "an expectation of confidentiality may be assumed" based on the nature of the document. 613 F.2d 1151, 1159 (D.C. Cir. 1979). In *American Trucking Associations v. City of Los Angeles*, the court enforced the privilege even though the government had "produced many of the withheld documents to" the Federal Maritime Commission because that disclosure was pursuant to an "express confidentiality provision." 2009 WL 10672284, at *6 (C.D. Cal. Dec. 21, 2009). And in the context of the bank examination privilege—"a close cousin of the deliberative process privilege," *In re Subpoena Duces Tecum Served on Off. of Comptroller of Currency*, 145 F.3d 1422, 1423 (D.C. Cir. 1998)—the D.C. Circuit has likewise made clear that the privilege is not waived by disclosure of bank examination materials to "the subject depository institution," *In re Subpoena Served Upon Comptroller of Currency & Sec'y of Bd. of Governors of Fed. Rsrv. Sys.*, 967 F.2d 630, 635 (D.C. Cir. 1992).

The precedent governing waiver of the attorney work-product protection supplies further support. Akin to the First Amendment Privilege's role in guarding an association's political adversaries from gaining "an unfair advantage," *Perry*, 591 F.3d at 1163 n.10 (cleaned up), the work-product protection "safeguard[s] the fruits of an attorney's trial preparations from the discovery attempts of the opponent" so as to "encourage effective trial preparation" and ensure that an attorney may "prepare his legal theories and plan his strategy without undue and needless

24

interference," *United States v. AT&T*, 642 F.2d 1285, 1299 (D.C. Cir. 1980). And consonant with this underlying goal, the D.C. Circuit has repeatedly held that a "voluntary disclosure to a third person" of work product does not waive the protection so long as the disclosure is "not inconsistent with maintaining secrecy against opponents" *Id.* Thus, in *AT&T*, the court held that MCI had not waived the privilege by disclosing withheld documents to the United States government, since it "share[d] common interests with the United States." *Id.* at 1300. And similarly, in *United States v. Deloitte LLP*, the court held that Dow Chemical did not waive the work-product protection by "disclosing work product to an independent auditor," since it "had a reasonable expectation of confidentiality," based on "a confidentiality agreement or similar arrangement" with the auditor that preserved the confidentiality of Dow's information absent its "specific consent." 610 F.3d 129, 139, 141–42 (D.C. Cir. 2010).

Under directly analogous principles, PLASTICS has not waived the protections of the First Amendment by storing some of its documents at the Hagley. The terms of the Hagley Agreement continue to protect PLASTICS' "reasonable expectation of confidentiality" in the documents, *id.* at 142, and "[t]hus, far from intending to waive the [documents'] confidentiality, [PLASTICS] attempted to preserve it," *Rockwell*, 235 F.3d at 604. Accordingly, the limited disclosure resulting from PLASTICS' arrangement with the Hagley is not inconsistent with the purposes of the First Amendment privilege and cannot be held to have waived it.

### 3. Compelled Disclosure of the Subpoenaed Information Is Not Tailored To Serve a Compelling State Interest.

Because enforcement of the subpoena would chill PLASTICS' First Amendment rights, the burden shifts to Mr. Bonta to "demonstrate[ ] an interest in obtaining the disclosures [he] seeks [that] is sufficient to justify the deterrent effect on the free exercise of the constitutionally protected right of association." *Perry*, 591 F.3d at 1161 (quoting *NAACP*, 357 U.S. at 463) (cleaned up).

Because of the importance of the First Amendment rights at stake, Defendant's showing "must survive exacting scrutiny." *Id.* at 1160 (quoting *Buckley*, 424 U.S. at 44). "Under that standard, there must be a substantial relation between the disclosure requirement and a sufficiently important governmental interest," and the disclosure requirement must be "narrowly tailored to the government's asserted interest." *Americans for Prosperity Foundation*, 594 U.S. at 607, 608 (plurality). Mr. Bonta is not likely to meet that standard.

Mr. Bonta's subpoena suggests in conclusory fashion that "PLASTICS' promotion and marketing or recycling plastic may have resulted in legal violations," Subpoena at 11, and his petition to enforce the subpoena, and accompanying public relations campaign, have vaguely, but repeatedly, intimated that PLASTICS' advocacy relating to recycling was "deceptive" in some way. But Mr. Bonta has not leveled any specific charges of wrongdoing, and the only fruit borne by his investigation so far appears to be a series of strident press releases. It is clear that Mr. Bonta has a very different perspective on matters of public policy related to plastics than Plaintiff does. But policy disagreement does not amount to an important or compelling government interest that justifies burdening First Amendment rights. Indeed, far from satisfying exacting scrutiny, Mr. Bonta's apparent interest in obtaining PLASTICS' privileged documents—speculation that perusing eight decades of PLASTICS' internal communications could unearth *something* that might conceivably support a claim of some kind—is not even legitimate, let alone compelling. "It is contrary to the first principles of justice to allow a search through all the [plaintiff's] r[e]cords, relevant or irrelevant, in the hope that something will turn up." *FTC v. Am. Tobacco Co.*, 264 U.S. 298, 306 (1924) (Holmes, J.). Bonta's investigation is targeted at speech and associational activities that are afforded broad constitutional protection, and such "investigations premised solely upon *legal* activity are the very type of 'fishing expeditions' that" the Supreme Court has

long made clear cannot be permitted. *Major League Baseball v. Crist*, 331 F.3d 1177, 1187–88 (11th Cir. 2003).

Even if Mr. Bonta could come forward with a sufficiently important interest in forcing disclosure of *some* of PLASTICS' confidential documents and communications, the breadth of his subpoena—both in time and subject matter—independently render it unconstitutional. The time period for the documents sought by Mr. Bonta dates back to 1937—*eight and a half decades ago*— and the subpoena seeks "ALL DOCUMENTS" "at any time housed at . . . the Hagley," including every single edition of the *Plastics Newsbriefs*, *President's Report to the Members*, and *State Bulletin*. Subpoena at 10. This "all documents" request, for records dating back to the first half of the twentieth century, plainly is not "narrowly tailored" to any important government interest Mr. Bonta may assert. *Americans for Prosperity*, 594 U.S. at 608 (plurality).

## II.    Plaintiff Will Suffer Irreparable Harm Absent an Order Restraining the Enforcement of Mr. Bonta's Subpoena.

PLASTICS has been suffering irreparable harm since the day that Defendant Bonta issued his subpoena. It is well-established that "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016) (internal quotation marks omitted); *see Quaker Action Grp. v. Hickel*, 421 F.2d 1111, 1116 (D.C. Cir. 1969) (finding the right to assemble and petition the government "so basic to our society that any deprivation might well be found to constitute irreparable injury"); *Cuviello v. City of Stockton*, 2008 WL 4283260, at *6 (E.D. Cal. Sept. 16, 2008) ("[I]mpairment of [the United States and California Constitutions] would constitute an irreparable injury."). PLASTICS is suffering that intangible, irreparable injury today and will continue to suffer it so long as the potential enforcement of the subpoena casts a shadow over its operations. PLASTICS staff and members have already limited their communications due to

Defendant Bonta's subpoena, Seaholm Decl. ¶¶ 43–44, and so "its constitutional injury has already occurred; there is no way for [PLASTICS] to avoid that alleged injury by challenging the document request later." *Twitter, Inc. v. Paxton*, 56 F.4th 1170, 1179 (9th Cir. 2022); *see also Unity08 v. FEC*, 596 F.3d 861, 865 (D.C. Cir. 2010) (expressing "reluctance to require parties to subject themselves to enforcement proceedings . . . where . . . First Amendment rights are implicated and arguably chilled by a credible threat of prosecution" (internal quotation marks omitted)).

Defendant Bonta's access to PLASTICS' documents would result in an immediate and irreversible constitutional harm. "[I]rreparable injury is frequently found when a movant seeks to prevent the disclosure of privileged documents pending litigation. That is generally because the holders of the privileges will, themselves, be irreparably harmed by release." *Trump v. Thompson*, 20 F.4th 10, 47 (D.C. Cir. 2021); *see also In re Burlington N., Inc.*, 822 F.2d 518, 522–23 (5th Cir. 1987) (finding that disclosure of privileged materials at the heart of the controversy between the parties would be irreparable). Bonta has already petitioned a California court to compel PLASTICS' production of the withheld documents. Absent emergency action from this Court, Bonta has demonstrated his intent to press ahead in California state court, undermining this Court's ability to issue effective final judgment and institute appropriate remedies.

## III.   The Balance of the Equities Favors Granting Preliminary Relief.

The remaining equitable factors also favor PLASTICS. "[T]here is always a strong public interest in the exercise of free speech rights otherwise abridged by an unconstitutional" state action. *Pursuing Am.'s Greatness*, 831 F.3d at 511. "[E]nforcement of an unconstitutional law is always contrary to the public interest." *Karem v. Trump*, 960 F.3d 656, 668 (D.C. Cir. 2020) (quoting *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013)). And because PLASTICS is "likely to succeed on the merits of [its First] Amendment claim, the public interest weighs heavily in [its] favor." *See Klayman v. Obama*, 142 F. Supp. 3d 172, 196 (D.D.C. 2015).

On the other side of the scale, Defendant Bonta has yet to articulate any significant interest. Defendant Bonta has already received many PLASTICS documents. That he has been unable to establish any legal violation, or any nexus between his investigation of PLASTICS and the *global* plastics pollution problem, is no reason to allow him to further intrude into PLASTICS' constitutionally-protected materials. Defendant Bonta "cannot legitimately claim to be 'harmed' as a result of being restrained from illegal conduct." *Prysmian Cables & Sys. USA, LLC v. Szymanski*, 573 F. Supp. 3d 1021, 1044 (D.S.C. 2021).

## CONCLUSION

For the foregoing reasons, the Court should grant a temporary restraining order and preliminary injunction, enjoining Defendant Bonta from further pursuing enforcement of his subpoena.

Dated:  July 12, 2024

Manesh Kumar Rath
(DC Bar No. 457835)
KELLER HECKMAN LLP
1001 G Street NW
Suite 500 West
Washington, DC 20001
(202) 434-4182
(202) 434-4646 (fax)
rath@khlaw.com

Respectfully submitted,

/s/Michael W. Kirk
Michael W. Kirk
(DC Bar No. 424648)
Adam P. Laxalt
(DC Bar No. 1670779)
John D. Ohlendorf
(DC Bar No. 1024544)
Athanasia O. Livas
(DC Bar No. 90011199)
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, NW
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (fax)
mkirk@cooperkirk.com
alaxalt@cooperkirk.com
johlendorf@cooperkirk.com
alivas@cooperkirk.com

*Attorneys for Plaintiff*